IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

JANE DOE, a minor, by and through her
next of friends, Daniel Magee and
Geneva Magee, DANIEL MAGEE,
individually, and GENEVA MAGEE, individually         PLAINTIFFS

v.                                                    CIVIL ACTION # 2:08cv204-KS-MTP

COVINGTON COUNTY SCHOOL DISTRICT, by
and through its Board of Education and its President,
Andrew Keys and its Superintendent of Education,
I.S. Sanford, Jr.; COVINGTON COUNTY
SUPERINTENDENT OF EDUCATION, I. S. SANFORD
officially and in his individual capacity; COVINGTON
COUNTY BOARD OF EDUCATION, by and through
its President, Andrew Keys; ANDREW KEYS,
officially and in his individual capacity; TOMMY
KEYES; and OTHER UNKNOWN JOHN DOE
AND JANE DOE EDUCATION DEFENDANTS A-Z,
also in their official and individual capacities          DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This cause is before the Court on the motion to dismiss on the basis of qualified immunity [Doc. #24] filed by Defendants Covington County School District, et al. The Plaintiffs, Jane Doe, Daniel Magee, and Geneva Magee, oppose the motion. [Doc. #27]. The primary question presented is whether a *DeShaney* "special relationship" arises between public school students attending school in compliance with a mandatory attendance statute and school employees, solely by virtue of the fact that the students are "very young." The Court holds that no special relationship arises in such circumstances and, as a result, the Defendants owed no constitutional duty to protect Doe from the dangers posed by non-state actors. For this reason, and for others to follow, the motion to dismiss should be **granted** with the federal claims

dismissed with prejudice.  The Plaintiffs' state law claims should be **dismissed without prejudice**.

## I. BACKGROUND

For the purposes of this motion to dismiss, the Court's recitation of the factual background assumes all of the Plaintiffs' factual allegations to be true. *See Babb v. Dorman*, 33 F.3d 472, 479 (5th Cir. 1994).

Defendant Tommy Keyes checked Plaintiff Jane Doe out from her public elementary school on six occasions to molest, rape, and sodomize her. Compl. at ¶¶ 1-2 [Doc. #1] (September 11, 2008). Although Keyes bares no relation to Doe, he was permitted to check her out of the Covington County Elementary School (the "School") on each occasion and to return her to the school after raping her. Compl. at ¶ 1. The School kept a "Permission to Check-out Form" containing the names of those individuals permitted to check Doe out of the School. *Id.* However, pursuant to established policy, the form was never consulted to determine whether Keyes was an authorized individual with respect to Doe. *Id.* Nor did any school employee ever attempt to verify Keyes' identity before relinquishing custody of Doe to him. *Id.* Accordingly, Keyes (who is not related to Doe) was able to sign Doe out of the School on the "Student Checkout Form" while representing himself to be different persons on different occasions. *Id.* For example, Keyes signed as Doe's father on several occasions and signed once as Doe's mother. *Id.* Each of these instances occurred between September 2007 and January 2008, when Plaintiff Jane Doe was nine years old. *Id.*

Doe and her parents, Daniel and Geneva Magee, filed suit against Covington County, Mississippi; Covington County School District; I.S. Sanford, Covington County Superintendent

of Education; Mississippi Department of Education; Covington County Board of Education; Hank Bounds, State Superintendent of Education; Tommy Keyes; and other unknown Defendants.[1]  Compl. at ¶¶ 12-17.  Plaintiffs allege claims under 42 U.S.C. §§ 1983 and 1985, and under Mississippi tort law.  Concerning the §§ 1983 and 1985 claims, Plaintiffs allege that the "Education Defendants" implemented a policy which violated Doe's constitutional rights under the Due Process Clause.

The Plaintiffs filed suit on September 11, 2008.  The Defendants filed the instant motion to dismiss on January 29, 2009.  The Court issued an order staying discovery pursuant to Local Rule 16.1(b)(4) on February 4, 2009.  The Plaintiffs filed their memorandum in opposition on February 12, 2009, [Doc. #27] and the Defendants filed a rebuttal memorandum on February 19, 2009.  [Doc. #28].

## II. STANDARD OF REVIEW

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009).  Qualified immunity protects even those "law enforcement officials who reasonably but mistakenly commit a constitutional violation."

---

[1] In prior orders, the Court dismissed the following Defendants: Covington County, Mississippi [Doc. #14]; Mississippi Department of Education [Doc. #23]; and Hank Bounds [Doc. #23].

3

*Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis omitted). Thus, qualified immunity "is a threshold question which acts as a bar to a court's right to adjudicate the claim." *Sutton v. United States*, 819 F.2d 1289, 1299 (5th Cir. 1987) (citing *Harlow*, 457 U.S. at 818). Indeed, it is imperative that the issue be resolved "at the earliest possible stage in litigation." *Hunter*, 502 U.S. at 227.

"[C]ourts evaluating § 1983 claims based on allegedly unconstitutional conduct by state actors should conduct a two-prong inquiry to determine whether the state actors are entitled to qualified immunity." *McClendon v. City of Columbia*, 305 F.3d 314, 322 (5th Cir. 2002) (citing *Siegert v. Gilley*, 500 U.S. 226, 232-34 (1991)). "[T]he first inquiry [is] whether a constitutional right would have been violated on the facts alleged." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). "[I]f a violation could be made out on a favorable view of the parties' submissions, the [second inquiry] is . . . whether the right was clearly established." *Id.* at 201. The sequence for conducting the inquiry was formerly mandatory, *Saucier*, 533 U.S. at 200, but the Supreme Court has recently held that district courts may proceed out of order when appropriate. *Pearson*, 129 S. Ct. at 818. Although the formerly mandatory sequence will often still be appropriate, courts can now begin with the second step to conserve the parties' or the court's resources, *id.*, or to abide "the general rule of constitutional avoidance'" to avoid questions of constitutionality "'unless such adjudication is unavoidable.'" *Id.* at 821 (quoting *Scott v. Harris*, 550 U.S. 372, 388 (2007) (Breyer, J., concurring)).

"When a defendant invokes qualified immunity, the burden is on the plaintiff to

4

demonstrate the inapplicability of the defense." *McClendon*, 305 F.3d at 323. "[T]he legally relevant factors bearing upon the . . . question will be different on summary judgment than on an earlier motion to dismiss." *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996). "At the earlier stage, 'it is the defendant's conduct *as alleged in the complaint* that is scrutinized for 'objective legal reasonableness.'" *McClendon*, 305 F.3d at 323. Hence, courts treat the plaintiff's contentions as true for the purposes of resolving such motions. *See Babb*, 33 F.3d at 479. However, "[t]o state a claim, a pleader must allege facts, not legal conclusions." *Hanson v. Town of Flower Mound*, 679 F.2d 497, 504 (5th Cir. 1982). The Fifth Circuit has emphasized that plaintiffs alleging claims likely to raise the issue of qualified immunity must allege with particularity all material facts, including "detailed facts supporting the contention that the plea of immunity cannot be sustained." *Elliott v. Perez*, 751 F.2d 1472, 1482 (5th Cir. 1985), *overruled on other grounds by Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1993); *accord Babb*, 33 F.3d at 477 (indicating that courts in this circuit remain bound by the heightened pleading standard announced in *Elliot*).

### III. APPLICATION AND ANALYSIS

**A. The Defendants' Actions, As Alleged in the Complaint, Violate No Constitutional Right of the Plaintiffs**

"[S]ection 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450 (5th Cir.1994). Although the Plaintiffs' complaint refers to several constitutional rights,[2] in their response to the instant motion, the Plaintiffs now argue a violation of only those

---

[2] The Complaint references the Equal Protection Clause and the Due Protection Clause of the Fifth and Fourteenth Amendments, as well as other "rights, privileges or immunities of the Plaintiffs." *E.g.*, Compl. at ¶ 21 [Doc. #1].

5

rights guaranteed by the Due Process Clause of the Fourteenth Amendment. Pl.s' Br. at 5-11 [Doc. #27] (February 12, 2009). Specifically, Plaintiffs claim the Defendants' actions violated the substantive component of the Due Process Clause, which "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Collins v. City of Harker Heights*, 503 U.S. 115 (1992) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).

The Plaintiffs have the burden of demonstrating that they have asserted a "recognized 'liberty or property' interest within the purview of the Fourteenth Amendment." *Griffith v. Johnston*, 899 F.2d 1427, 1435 (5th Cir. 1990). Although it is undisputed that the Fourteenth Amendment provides a recognized "right to be free of *state*-occasioned damage to a person's bodily integrity," *e.g.*, *Taylor Indep. Sch. Dist.*, 15 F.3d at 451(emphasis added), "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 195 (1989).

The fact that substantive due process rights generally proscribe, rather than prescribe, government action is a significant hurdle for the Plaintiffs. *See, e.g.*, *Walton v. Alexander*, 44 F.3d 1297, 1305 (5th Cir. 1995) (en banc) ("extending the Due Process Clause to impose on the state the obligation to defend and to pay for the acts of non-state third parties is a burden not supported by the text or history of the Clause, nor by general principles of constitutional jurisprudence."). Both the Supreme Court and the Fifth Circuit have emphasized their disinclination to expand substantive Due Process rights in the realm of governmental protection against harm caused by private actors. The Supreme Court explained that while "[j]udges and

6

lawyers, like other humans, are moved by natural sympathy" in these types of cases, Courts should not "yield[ ] to that impulse" of holding that the wrong at issue infringed upon Due Process rights. *DeShaney*, 489 U.S. at 202. Moreover, the Fifth Circuit has noted that "[r]efusing to create a whole new class of constitutional rights" in these cases generally "does not leave the student without legal protection." *Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412, 1415 (5th Cir. 1997) (en banc).

Notwithstanding the general rule that the Due Process Clause does not provide a right to government protection from non-state actors, courts have recognized two scenarios in which a right to governmental protection can obtain. Accordingly, the Court will consider the applicability of each with regard to the facts in this case.

### 1. The State-Created-Danger Exception

A number of courts outside this circuit have read *DeShaney* "to suggest [an] exception to the general rule against state liability for private violence," in which "state officials can have a duty to protect an individual from injuries inflicted by a third party if the state actor played an affirmative role in creating or exacerbating a dangerous situation that led to the individual's injury." *McClendon*, 305 F.3d at 324. The Fifth Circuit, however, has never expressly accepted this exception. *E.g.*, *id.* at 334 (Parker, J., dissenting) ("The only way to explain the majority opinion is that it clearly reflects a court that aspires to be the only circuit in the country to reject the state-created danger theory but cannot bring itself to admit it."); *Hillsboro Indep. Sch. Dist.*, 113 F.3d at 1415 ("we have never sustained liability on this ground."). As a result, the exception is of no assistance to the Plaintiffs.

Even if, however, the exception were recognized in this circuit, enabling the Plaintiffs to allege a "clearly established" right to protection in such circumstances, the facts alleged in this

7

case do not meet the elements of the theory. "In *Johnson* [the Fifth Circuit] observed that 'the environment created by the state actors must be dangerous; they must know it is dangerous; and, to be liable, they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur.'" *Hillsboro Indep. Sch. Dist.*, 113 F.3d at 1415 (citing *Johnson*, 38 F.3d 198, 201 (5th Cir. 1994)). There is no potential for liability under this exception if the defendant did not have "'actual knowledge' of, and disregard[ ], an 'excessive risk'" to the plaintiff. *Teague v. Tex. City Indep. Sch. Dist.*, 185 Fed. App'x 355, 357 (5th Cir. 2006) (unpublished) (citing *McClendon*, 305 F.3d at 326 n.8). Thus, a defendant must have known of the danger created. *Goad v. Lanier*, No. H-06-0718, 2006 U.S. Dist. LEXIS 40202, *23 (S.D.Tex. June 16, 2006) (citing *Johnson*, 38 F.3d at 201). Here, the Plaintiffs do not allege that the Defendants knew of the danger that Doe would be checked out by a stranger and sexually assaulted, nor can the Court infer this knowledge based on the Plaintiffs' pleadings. By permitting an individual to check a young student from school without first verifying the individual's identity and authorization, the School employees almost certainly acted carelessly. But, without some allegation or indication of *deliberate* indifference by the Defendants to a known danger, the state-created-danger exception would be of no avail to the Plaintiffs even if it were recognized in this circuit.

### 2. The Special Relationship Exception

Unlike the state-created-danger exception, the so-called "special relationship" exception has been recognized by both the Supreme Court, *e.g.*, *Estelle v. Gamble*, 429 U.S. 97 (1976), and the Fifth Circuit. *E.g.*, *Walton*, 44 F.3d at 1302. In *DeShaney v. Winnebago*, the Supreme Court outlined the elements of the exception, writing that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding

duty to assume some responsibility for his safety and general well-being." *Id.* at 199-200. Thus, a special relationship has been held to exist when the government has either imprisoned an individual or involuntarily confined a person in a mental institution. *Id.* at 198 (citing *Estelle*, 429 U.S. 97; *Youngberg v. Romeo*, 457 U.S. 307 (1982)).

In the case at bar, the Plaintiffs argue that the special relationship exception is properly extended to the custodial relationship that exists between a school and its very young students. This is far from the first instance in which a court in this circuit has been asked to extend the special relationship exception into the public school setting. Plaintiffs seeking this extension have been denied by courts almost without exception. *E.g.*, *Walton,* 44 F.3d 1297*; Hillsboro Indep. Sch. Dist.*, 113 F.3d at 1415; *but see Teague v. Tex. City Indep. Sch. Dist.*, 348 F. Supp. 2d 785 (S.D.Tex. 2004), *vacated by* 386 F. Supp. 2d 893 (S.D.Tex. 2005). Despite the abundant caselaw on the subject, several courts have indicated their belief that the argument for extending the special relationship into the public school setting is not entirely foreclosed. *E.g.*, *A. ex. rel. B. v. Laredo Indep. Sch. Dist.*, No. 5:05-CV-237, 2007 U.S. Dist. LEXIS 4445, *9 (S.D.Tex. Jan. 22, 2007). In particular, there arguably remains an unsettled question as to whether a special relationship exists between schools and the "very young" children in their custody. This Court holds that a special relationship does not arise in the public school setting solely due to the young age of the students in the school's custody. To elucidate this holding, it is necessary to consider the line of cases that has shaped the jurisprudence in this circuit following the Supreme Court's decision in *DeShaney*.

In 1994, a Fifth Circuit panel evaluated a § 1983 claim brought by the father of a deceased high school student who had been killed by a non-student trespassing onto the school's campus. *Johnson*, 38 F.3d 198. Because the court found the student's death to be "attributable

9

to the fortuity that an armed, violent *non-student* trespassed on campus," the court declined to reach the issue of whether a special relationship existed. *Id.* at 203. Instead, the court reasoned that even if one had existed, there could be no liability in that instance lest schools become "virtual guarantors of student safety." *Id.* Nonetheless, in dicta, the *Johnson* court wrote that "a persuasive argument can be made for applying a *DeShaney* 'special relationship'" in instances in which there is a combination of a compulsory attendance law and a lack of choice for the student in which school he could attend. *Id.* at 203. The court then explained in some detail, in a footnote, its support for the proposition that a special relationship arises in the public school setting. *Id.* at 203 n.7. In the footnote, the court argued that the holding of other courts that public schools do not have "custody" over students "appears to derive less from logic than from a pragmatic desire to limit . . . legal liability." *Id.* In support of this contention, court wrote:

> To say that student attendance is voluntary because parents may elect to home-school their children or send them to a private school is lamentably, for most parents, a myth. To intimate that parents retain effective responsibility for their children's well-being when the school alone makes critical decisions regarding student safety and discipline is inaccurate. To suggest that parents somehow are in a better position than the schools to protect their children from the ravages of weapons smuggled onto campus during the school day is cruelly irrational. To hope that students who are unarmed can protect themselves from the depredation of armed criminals in their midst is ridiculous.

*Id.* In subsequent cases, however, the Fifth Circuit has either ignored this dicta from *Johnson* or has disagreed with it.

The following year, for example, the Fifth Circuit all but eliminated the possibility that a special relationship could arise out of a public school setting. In *Walton v. Alexander*, the en banc court evaluated a § 1983 claim brought by a student who had been sexually molested by a fellow classmate while attending a state institution, the Mississippi School for the Deaf. 44 F.3d

10

at 1299. Students attending the school experienced significant school-imposed restrictions on their liberty. As residents of the school, the students slept and took their meals at ths school. In addition, the school regulated when the students could come and go, "severely restrict[ing] the conditions under which [students] could leave the campus." *Id.* at 1305. Nonetheless, the court interpreted *DeShaney* "strictly," *id.* at 1308, and held that the custodial control exerted over the students was insufficient for a special relationship to arise. *Id.* at 1304-05. The *Walton* court ruled that a special relationship arises only if [i] a "governmental order or . . . affirmative exercise of state power," *id.* at 1299, that [ii] "involuntarily confine[s] or otherwise restrain[s an individual] against his will," *id.*, [iii] leaving the individual with "no realistic means of voluntarily terminating the state's custody," *id.* at 1305, and [iv] which "deprives [him] of the ability or opportunity to provide for his own care and safety." *Id.* The *Walton* court held that no special relationship existed, reasoning that the plaintiff had voluntarily submitted himself to the restrictions, *id.* at 1305, and because his "relinquishment of a small fraction of liberty simply *is not comparable* to that measure of *almost total deprivation* experienced by a prisoner or involuntarily committed mental patient. *Id.* (emphasis added)

*Walton* represented a relatively major shift in direction for the court.[3] First, the Court ignored the language from *Johnson* which had strongly hinted that a special relationship could arise in a public school setting (the en banc majority never acknowledged *Johnson*). Second, the *Walton* court overruled its decision in *Lopez v. Houston Indep. Sch. Dist.*, 817 F.2d 351 (5th Cir. 1987). The *Lopez* court had held that a school bus driver's failure to protect one child from

---

[3] The en banc decision in *Walton* reached a result contrary to that of the original panel decision, which held that a special relationship existed between the students at the Mississippi School for the Deaf and the school employees. 20 F.3d 1350, 1354 (1994). The court had reasoned that a special relationship arose due to the limitations imposed on the students' freedoms. *Id.* at 1355.

11

injury inflicted by another child supported a § 1983 action because the driver had been entrusted with the students' care. *Id.* at 356. Reacting to *Walton's* overruling of *Lopez*, Judge Parker wrote in his concurrence:

> Following this decision, parents should be aware when the school bus doors close that if their child is sexually or physically assaulted, the driver of the bus has no constitutional duty to intervene, stop the assault, summon assistance, or attend to any injuries that may have been sustained. Under the majority's reasoning, he may with full knowledge of the assault be totally indifferent to it.

*Id.* at 1309 (Parker, J., concurring). In other words, Judge Parker interpreted *Walton* to hold that public school employees have no duty to protect a student from danger posed by non-state actors. *Id.* at 1310 (Parker, J., concurring) ("citizens who . . . deliver a child to the care, custody and control of the State, do so at their own risk.").

Any possibility that *Walton* could eventually be distinguished on the grounds that the plaintiff had not been compelled by state law to attend the school was foreclosed when the Fifth Circuit decided *Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412 (1997). In *Hillsboro*, a 14-year-old eighth grade student was raped by a custodian (who was not a state actor) in an empty classroom at the public school she attended. *Id.* at 1413. The en banc court held as a matter of law that no special relationship existed, even though the student may have been "in the school at the time of the assault under compulsion of state attendance laws." *Id.* at 1414 n.2. The *Hillsboro* court marginalized the significance of whether the student was attending the school voluntarily, rationalizing that while it was "true that . . . we had emphasized the absence of this legal compulsion [in *Walton*, it] is equally true that poor students may have had no real alternatives." *Id.* at 1414. Instead of focusing on voluntariness, the *Hillsboro* court emphasized that the restrictions imposed by public schools on their students – even when rising to the level imposed in *Walton* – are not "sufficiently akin to [those imposed on] prisoners and persons

12

committed to mental institutions to trigger a constitutionally rooted duty." 113 F.3d at 1415.

In support of its holding that the type of restrictions on freedom imposed by compulsory attendance laws are not "sufficiently akin" to those imposed on prisoners and persons involuntarily committed to mental institutions, the Court wrote:

> The custody [in schools] is intermittent and the student returns home each day. Parents remain the primary source for the basic needs of their children. Finally, we find helpful the rationale of the Supreme Court's decision in *Ingraham* to deny school children the protections of the Eighth Amendment:
>
>> The school child has little need for the protection of the Eighth Amendment. Though attendance may not always be voluntary, the public school remains an open institution. *Except perhaps when very young, the child is not physically restrained from leaving school during school hours*; and at the end of the school day, the child is invariably free to return home. Even while at school, the child brings with him the support of family and friends and is rarely apart from teachers and other pupils who may witness and protest any instances of mistreatment.

*Hillsboro Indep. Sch. Dist.*, 113 F.3d at 1415 (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)) (emphasis added). With regard to the all-but-forgotten dicta from *Johnson* endorsing the view that a special relationship arises out of compulsory attendance laws, the *Hillsboro* court simply cited the *Johnson* footnote and wrote, "[t]here are concerns pointing in a different direction." *Id.* at 1415.

The Plaintiffs in this case focus on the language in *Hillsboro*, emphasized above, which states that "[e]xcept perhaps when very young, the child is not physically restrained from leaving school during school hours." *Hillsboro Indep. Sch. Dist.*, 113 F.3d at 1415 (quoting *Ingraham*, 430 U.S. at 670). The Plaintiffs contend that this language indicates that a special relationship arises when a "very young" child is compelled to attend public school. *See* Pl.s' Br. at 10. Previous proponents of this argument have also pointed to the language in *Hillsboro* in which the court "decline[d] to hold that compulsory attendance laws *alone* create a special relationship."

13

113 F.3d 1412 (emphasis added); *see, e.g.*, *Teague v. Tex. City Indep. Sch. Dist.*, 348 F. Supp. 2d 785, 792 (S.D.Tex. 2004), *vacated by* 386 F. Supp. 2d 893 (S.D.Tex. 2005).

Hence, the Plaintiffs argue – as have others before them – that the Fifth Circuit has left open the possibility that compulsory school attendance, when combined with other factors, can create a constitutionally significant special relationship. This seems a relatively uncontroversial proposition; if, hypothetically, a school were to metamorphose into a quasi-prison, the factual inquiry into whether a special relationship existed very well might yield different results. *See, e.g.*, *A. ex. rel. B.*, 2007 U.S. Dist. LEXIS 4445, at *9 ("[t]his case law . . . does not categorically foreclose [the] argument that custody arises out of school attendance in some circumstances."). However, this Court is not tasked with determining whether there are some imaginable circumstances in which the Mississippi compulsory attendance statute, combined with other factors, could create a special relationship. Instead, it is tasked with determining whether a special relationship arises from the factual allegations in the case at hand. To that end, the Court is not persuaded that the "[e]xcept perhaps when very young" language, quoted in *Hillsboro*, constitutes a loophole in the Fifth Circuit's steadfast holdings that school-imposed restrictions generally do not create *DeShaney* special relationships. This conclusion inheres from the unique factual allegations in this case combined with an optimal reading of the caselaw.

First, the Court deems crucial the absence of any allegation by the Plaintiffs that Doe was ever physically restrained from leaving the school.[4] In the absence of such an allegation, the Plaintiffs' argument must hinge on the premise that the "[e]xcept perhaps when very young"

---

[4] Similarly, the Plaintiffs have failed to specifically allege that Doe was compelled to attend the School. Nonetheless, the Court believes it is appropriate to infer this fact (for the purposes of this Opinion) because of Doe's age and residence in Covington County. Compl. at ¶ 8; *see generally* MISS. CODE ANN. § 37-13-91(3) (compulsory school attendance required for children between the ages of six and seventeen).

14

language creates *ipso facto* a presumption that physical restraints analogous to those used in prisons and mental institutions are always employed to restrain students who are "very young." This presumption seems undoubtedly fictitious to this Court – bearing in mind that Doe was nine years old at the time of the incidents – and is one which this Court will not impose. *See Elliott*, 751 F.2d at 1482 (the Plaintiff has the burden of pleading "detailed facts supporting the contention that the plea of immunity cannot be sustained.").

Moreover, the Court finds no support in the jurisprudence for concluding that the young age of a student should be deemed to automatically create a *DeShaney* special relationship. By grasping at a portion of just one sentence in the *Hillsboro* opinion – a sentence that was originally written by a different Court, analyzing a distinct issue – the Plaintiffs overlook the unyielding brunt of *Walton* and *Hillsboro*. That is, that students face *categorically distinct* government-imposed restrictions on their liberties than do prisoners and involuntarily committed mental patients. *Walton*, 44 F.3d at 1305 (calling the relinquishment of liberty "simply . . . not comparable"); *Hillsboro*, 113 F.3d at 1415 (holding that the restrictions imposed by schools are not "sufficiently akin to [those imposed on] prisoners and persons committed to mental institutions."). To read *Walton* or *Hillsboro* as recognizing that a special relationship automatically arises in the public school setting when the students are "very young" would be an unduly broad reading of those cases. *A. ex. rel. B.*, 2007 U.S. Dist. LEXIS 4445, *10-11 ("it is not at all clear that the Fifth Circuit would consider . . . age as a variable worthy of distinguishing treatment"); *Richardson v. Tangipahoa*, No. 08-111, 2008 U.S. Dist. LEXIS 89499 (E.D.La. July 28, 2008); *see generally Doe v. Sabine*, 24 F. Supp. 2d 655, 664 (W.D.La. 1998) ("a district court should be reluctant when addressing sensitive constitutional issues to read appellate decisions in an overly broad fashion."); *Walton*, 44 F.3d at 1305 ("We think it is

important to apply *DeShaney* as it is written.").[5]

Moreover, the Court rejects the Plaintiffs' argument based on the "[e]xcept perhaps when very young" language because their argument unjustifiably misconstrues the point being made by the *Hillsboro* court: namely, that school-imposed restrictions on liberty are different in kind from those imposed by prisons and mental institutions. To that end, the *Hillsboro* court was listing the obvious differences between these institutions' restrictions: [i] schools' custody is intermittent, with students returning home each day; [ii] parents remain the primary source of support; [iii] schools are open institutions, so students are generally not physically restrained from leaving ("[e]xcept perhaps when very young"); and [iv] while at school, the child still has the support of family and friends and is rarely apart from teachers and other pupils. *Hillsboro Indep. Sch. Dist.*, 113 F.3d at 1415 (citing *Ingraham*, 430 U.S. at 670). By arguing that youth alone creates a special relationship, the Plaintiffs treat the court's reasoning as setting forth a list of elements, whereby the absence of one of them could convert the public school setting into one featuring a special relationship. This is a strained reading of *Hillsboro* and is belied by the cases cited in this Opinion, in which the Fifth Circuit has not treated these points as dispositive elements. In *Walton*, for example, custody was not intermittent and students did not return home

---

[5] Several courts have been presented with factual circumstances in which the argument based on the "[e]xcept perhaps when very young" language could have been raised but apparently was not. In *Doe v. Sabine*, for example, a six-year-old kindergarten student was sexually abused, harassed, and battered by his classmates. 24 F. Supp. 2d 655, 657 (W.D.La. 1998). The student's parents filed suit against the kindergarten teacher, the school's principal, and the school board. *Id.* The court determined that no special relationship existed between the defendants and the student, though the court did not expressly consider the "except perhaps when very young" language as a possible basis for ruling otherwise. *Id.* at 660-61 (citing *Walton*, 44 F.3d at 1299). In *Doe v. Richardson Indep. Sch. Dist.*, a kindergarten student had been subjected to sexual advances by another student. No. 3:96-CV-2711, 1998 U.S. Dist. LEXIS 1891, *2-6 (N.D.Tex. Feb. 10, 1998). Again, the court determined that no special relationship existed without considering the "except perhaps when very young" language. *Id.* at *8-9.

<mark>16</mark>

from school each day. Nonetheless, the court held no special relationship existed. In *Hillsboro*, the victim was alone in a classroom, apart from teachers and other pupils, when she was raped. Nonetheless, the court held no special relationship existed. Although an extreme imposition of physical restraints might be a critical distinction, the Plaintiffs here rely on youth alone to distinguish the case, and the Court finds no basis for concluding that Doe's age is a distinction with a difference.[6]

For these reasons, the Court concludes that no special relationship existed between Doe and the Defendants and that the Defendants had no constitutional obligation to protect Doe against dangers posed by non-state actors. As a result, the motion should be granted and all of the Plaintiffs' federal and constitutional claims should be dismissed with prejudice.

**B. Even if the Defendants' Actions Violated a Constitutional Right, the Right Was Not Clearly Established at the Time of the Incidents Giving Rise to this Case**

"Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Pearson*, 129 S. Ct. at 816. A right is clearly established only

---

[6] The only case in this circuit that lends support to the possibility that a special relationship can arise in a school setting is *Teague v. Tex. City Indep. Sch. Dist.*, 348 F. Supp. 2d 785 (S.D.Tex. 2004). Even the *Teague* court, however, did not rely on the "[e]xcept perhaps when very young" language as a basis for its holding. In *Teague*, the mother of a high school special education student filed suit under section 1983 after the student was sexually assaulted by another student. *Id.* at 785. Explaining that it believed *Hillsboro* left open the possibility that a special relationship could arise from compulsory attendance laws "in combination with other factors," the court held that a student suffering from "identified intelligence deficiencies such as Down's Syndrome" are in a special relationship because they are "fundamentally different" from all other students. *Id.* The court focused on the unique traits of such students: "They are required . . . to come to school each day . . . in specially segregated and highly structured class environments . . . are not free to leave, or to meaningfully alter this . . . environment . . . [and] are completely dependent upon those in charge to safeguard their person." *Id.* at 793.
 The court vacated its holding the following year, however, after the evidence revealed that the student had not been subject to compulsory attendance laws and had actually functioned at the level of a 13-year-old. 386 F. Supp. 2d 893 (S.D.Tex. 2005), *aff'd by* 185 Fed. App'x 355 (5th Cir. 2006).

17

if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "This inquiry focuses not on the general standard . . . but on the specific circumstances of the incident." *Ontiveros v. City of Rosenberg*, __ F.3d ___, No. 08-20081, 2009 U.S. App. LEXIS 6909, *8 n.1 (5th Cir. Mar. 30, 2009).

The Plaintiffs' argument that there existed a clearly established substantive due process right for public school students to receive governmental protection from non-state actors is without merit.[7] *E.g.*, *Walton*, 44 F.3d at 1306 (holding that the superintendent had "no constitutional duty, *much less a clearly established duty*," to protect Walton against his classmate's violence (emphasis added)). As the *Walton* court recognized, the Fifth Circuit has never extended "the right to be free of state-occasioned damage to a person's bodily integrity" to encompass harm inflicted by a private actor outside the context of involuntary confinement. *Id.* at 1302. Accordingly, even if a constitutional right to governmental protection inhered in the public school context, that right was not clearly established during the time period in which Doe

---

[7] The Court does not believe that this case is one in which it ought to skip the inquiry into "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right" to advance directly to the issue of "whether the right at issue was 'clearly established.'" *See generally Pearson*, 129 S. Ct. 808. The Court notes that one rationale behind the *Saucier* opinion mandating that courts first determine whether the plaintiff had alleged a constitutional right was "to support the Constitution's 'elaboration from case to case' and to prevent constitutional stagnation." *Id.* at 816. Although the argument regarding the "[e]xcept perhaps when very young" language has been advanced on several prior occasions, there remains no opinion in this circuit considering the merits of the argument in any detail. In addition, no resources would be saved by skipping the first step. The parties opted to fully brief the issue of whether a constitutional right exists and the Court would be compelled to discuss the caselaw in comparable detail to explain why the right is not clearly established, even were it to skip the first inquiry. Finally, since the Court reaches its conclusion based primarily on its reading of binding caselaw, the Court does not believe the avoidance canon recommends against considering the issue.

was victimized. As a result, the Defendants are entitled to qualified immunity and the federal and constitutional claims against them should be dismissed with prejudice.

## IV. CONCLUSION

A constitutional "special relationship" does not exist between public school students, attending their schools in compliance with mandatory attendance laws, and school employees, solely by virtue of the fact that the students are "very young." For this reason, and because the state-created-danger theory has never been held to be a basis for sustaining liability in this circuit, the Defendants are entitled to qualified immunity against the Plaintiffs' federal and constitutional claims. Because the Plaintiffs' federal claims are all dismissed at a relatively early stage in the proceedings, the Court declines to exercise pendent jurisdiction over the state claims, instead dismissing them without prejudice. *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992).

IT IS, THEREFORE, ORDERED AND ADJUDGED that the Defendants' motion to dismiss [Doc. #24] is **granted** and all federal and constitutional claims brought by the Plaintiffs are **dismissed with prejudice**. FURTHERMORE, IT IS, THEREFORE, ORDERED AND ADJUDGED that the Plaintiffs' state claims are **dismissed without prejudice**.

SO ORDERED AND ADJUDGED on this, the 27th day of April, 2009.

> *s/Keith Starrett*
> UNITED STATES DISTRICT JUDGE